STATE OF CONNECTICUT *v.* BENJAMIN CAMPFIELD
(11386)

Landau, Heiman and Daly, Js.

Argued September 17—officially released December 31, 1996

*Erskine D. McIntosh,* for the appellant (defendant).

*James M. Ralls,* assistant state's attorney, with whom, on the brief, were *Donald Browne,* state's attorney, and *Cornelius Kelly,* assistant state's attorney, for the appellee (state).

DALY, J. The defendant appeals from the judgment of conviction, after a jury trial, of two counts of attempted murder in violation of General Statutes (Rev. to 1995) §§ 53a-49 and 53a-54a (a) and two counts of attempted assault in the first degree in violation of General Statutes (Rev. to 1995) §§ 53a-49 and 53a-59 (a).[1] The defendant claims that (1) certain prearrest and trial identification procedures violated his right to due process, (2) the warrantless search of his automobile violated his right to be free from unreasonable searches, (3) the admission into evidence of his refusal to submit to a gun powder residue test violated his rights to counsel, to due process and against self-incrimination, (4) the trial court improperly instructed the jury that one can simultaneously possess the intent to cause death and the intent to cause serious physical injury, (5) the judgments of conviction of attempted murder and attempted assault in the first degree violated the guarantee against double jeopardy, (6) the jury verdicts were

---

[1] The jury found the defendant not guilty of two counts of reckless endangerment in the first degree under General Statutes (Rev. to 1995) § 53a-63.

not supported by sufficient evidence, and (7) the trial court improperly denied his request to instruct the jury regarding the definition of "planned" as it is used in § 53a-49. We affirm the judgment of the trial court.

The following facts are relevant to this appeal. At approximately midnight on April 10, 1991, Trumbull police officer Kevin Hammel saw a dark colored BMW with Georgia license plates turn onto Main Street and proceed north. The automobile rapidly accelerated and Hammel, traveling behind it, tracked its speed with the radar in the police vehicle. Before Hammel could activate his overhead lights or siren, the driver of the BMW pulled over and stopped. As Hammel approached the BMW, he noted that it appeared to be brown or dark in color. Hammel asked the driver for his operator's license, registration and insurance identification card. Because the driver did not have his license in his possession, Hammel wrote the driver's date of birth on the insurance card and radioed police headquarters and ascertained that the driver had a valid Connecticut operator's license. Hammel gave the driver an oral warning and released him.

Shortly after midnight, Ivan Mikolic was driving with a passenger, Tracey O'Connor, in his automobile on Stonehouse Drive in Trumbull. Mikolic and O'Connor noticed that an automobile with four round headlights was closely following them and occasionally flashing its high beams. Mikolic recognized the automobile as a BMW. Mikolic turned into a driveway to allow the BMW to pass. After passing Mikolic's vehicle, the BMW made a U-turn toward Mikolic's vehicle and stopped, while Mikolic pulled back out of the driveway to proceed in the direction he and O'Connor had been driving. Thinking that the driver of the BMW needed help, Mikolic drove to within a short distance of it and parked at an angle so that his headlights illuminated both the automobile and its driver. The defendant was the driver

of the BMW, which was dark in color and appeared to be brown. After several seconds, the defendant pointed a gun and fired five shots at Mikolic and O'Connor. Bullets entered the hood, the left front tire, mud flap, fender and driver's side door, and shattered the driver's side window. Mikolic and O'Connor ducked and drove away, and the defendant drove away in the opposite direction. Mikolic and O'Connor abandoned Mikolic's vehicle because of the flat left front tire. They ran to O'Connor's house and called the police.

Hammel and other police officers subsequently arrived at O'Connor's house and spoke with Mikolic and O'Connor. Hammel noted the similarities between Mikolic's description of the driver and the automobile involved in the shooting and the driver and BMW he had stopped earlier that evening on Main Street in Trumbull. On the basis of those similar descriptions, the Trumbull police staked out the defendant's house about a quarter mile from the shooting incident and notified the surrounding towns' police departments about the incident so that they could assist in locating the defendant. A short time later, at approximately 2 a.m., the defendant and his automobile were found by the Bridgeport police at the intersection of Hollister and Stratford Avenues. Hammel went to the scene and identified the defendant as the driver he had stopped earlier. He then removed the insurance identification card from the glove compartment, saw the driver's date of birth that he had written on the card at the earlier traffic stop and noticed that the car appeared to be blue.

Officer Susan Hamilton of the Trumbull police department drove Mikolic and O'Connor to Bridgeport to view the defendant. As they approached the location where the police were holding the defendant, Mikolic and O'Connor recognized the defendant's car, although it now appeared to them to be blue. Hamilton then turned the police vehicle's lights toward a group of police offi-

cers and others. Mikolic and O'Connor identified the defendant as the man who had shot at them earlier. The defendant later admitted that he owned a .38 caliber revolver, but claimed that he had last seen it several days before at his residence. At trial, Mikolic and O'Connor again identified the defendant as the individual who had shot at them on the evening in question.

I

The defendant first asserts that the admission of the out-of-court and in-court identifications of him by Mikolic and O'Connor violated his due process rights under article first, §§ 8 and 9, of the Connecticut constitution. After a full evidentiary hearing, the trial court denied the defendant's motion to suppress the out-of-court identification pursuant to the fifth and fourteenth amendments to the federal constitution. The defendant now claims that the out-of-court identification tainted the in-court identification and that the admission of both identifications violated the Connecticut constitution. Because these claims are raised for the first time on appeal, the defendant seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

A party can prevail on a claim not adequately presented at trial only if all of the following conditions are met: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id., 239–40. "Under *Golding* . . . this court is free to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances. . . ." (Citations omitted; internal quotation marks omitted.)

*State* v. *Pratt*, 235 Conn. 595, 603, 669 A.2d 562 (1995). We, therefore, focus here on the third prong of *Golding*, i.e., whether the alleged constitutional violation clearly exists and, if so, whether it clearly deprived the defendant of a fair trial. We conclude that the defendant cannot prevail on this claim because a constitutional violation does not clearly exist.

In reviewing a trial court's decision to admit evidence of identification, "[w]e will reverse the trial court's ruling . . . only where there is abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the issue of the reliability of an identification involves the constitutional rights of an accused, [however] we are obliged to examine the record scrupulously to determine whether the facts found [by the trial court] are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable." (Citations omitted; internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 155, 665 A.2d 63 (1995). We inquire "whether the identification procedure was unnecessarily suggestive . . . [and if so] . . . whether the identification was nevertheless reliable based on an examination of the totality of the circumstances." (Internal quotation marks omitted.) Id., 155–56. "[R]eliability is the linchpin in determining the admissibility of identification testimony . . . ." (Internal quotation marks omitted.) Id., 157, quoting *Manson* v. *Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

To prevail on this claim, the defendant must establish that the identification was both unnecessarily suggestive and unreliable under the totality of the circumstances. *State* v. *Figueroa*, supra, 235 Conn. 155–56. Because our determination that the identifications were reliable would obviate the need to determine whether

they were "unnecessarily suggestive"; see id.; we address the reliability issue first.

The trial court determined that the out-of-court identification was neither unnecessarily suggestive nor unreliable under the totality of the circumstances. In reviewing that determination, we consider the following factors: the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. See *State* v. *Mitchell*, 204 Conn. 187, 202, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987).

As the trial court noted, the victims saw their assailant, who was visible in their automobile headlights, the victims testified that they looked at the face of their assailant to determine if they knew him or if he needed assistance, their description of their assailant to the police was consistent with the defendant's appearance at the out-of-court identification, the victims displayed a high level of certainty that the defendant was their assailant, and the time between the shooting and the confrontation was only approximately two hours. We conclude that the out-of-court identification was reliable under the totality of the circumstances. We, therefore, need not consider whether the victims' identification was unnecessarily suggestive. *State* v. *Figueroa*, supra, 235 Conn. 157. The defendant's right to due process was not violated by the admission of the out-of-court identification. By extension, the defendant's right to due process was not violated by the in-court identification because the in-court identification could not have been tainted by an out-of-court identification that was, itself, proper. We conclude that a violation of a constitutional right did not clearly exist.

The defendant has failed to satisfy the third prong of *Golding*.

## II

The defendant next claims that the warrantless search of his automobile violated article first, § 7, of the Connecticut constitution. Because he did not raise this issue in the trial court, the defendant again seeks review under *State* v. *Golding*, supra, 213 Conn. 233. The state maintains that this claim is not reviewable because the trial court made no factual findings that would satisfy the first prong of *Golding*.

We first consider whether the record is adequate for review. Under *Golding*, a conclusion of law can properly be made by an appellate court even if the trial court was never asked to make, and never made, such a determination, as long as the factual record is adequate to provide the basis for such a conclusion. *State* v. *Torres*, 230 Conn. 372, 379, 645 A.2d 529 (1994). In the present case, Hammel testified that when he arrived in Bridgeport on the evening in question, he observed the defendant in custody in the back seat of a Bridgeport police car. The defendant's car was empty and bore the same license plates as the vehicle he had stopped in Trumbull earlier that evening. Hammel testified that because the color of the automobile now appeared different from the color it had appeared to be during the earlier stop, he reached into the glove compartment to ascertain whether the insurance card on which he had written the driver's date of birth during the earlier stop was present. He determined that it was. On the basis of that testimony, we conclude that the trial court record in this case contains the factual basis for appellate consideration of the defendant's claim.

We next consider whether the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial. In *State* v. *Badgett*, 200 Conn. 412,

512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986), our Supreme Court held that where a defendant is restrained as a result of a lawful custodial arrest and has remained at the scene of the arrest, his vehicle may be searched incident to the arrest. Id., 424, citing *New York* v. *Belton*, 453 U.S. 454, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981). *Badgett* raised no state constitutional claim. In *State* v. *Delossantos*, 211 Conn. 258, 266–67, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989), we held, pursuant to article first, § 7, of the Connecticut constitution that when police officers make a lawful custodial arrest of an occupant of an automobile, and the arrestee is detained at the scene, the police may contemporaneously search the interior compartment of the automobile without a warrant. See also *State* v. *Waller*, 223 Conn. 283, 290, 612 A.2d 1189 (1992). For that purpose, the passenger compartment encompasses all the space reachable without exiting the vehicle. *State* v. *Delossantos*, supra, 267. Such a search is a valid search incident to an arrest without consideration of whether there is probable cause to believe that the motor vehicle contained contraband or evidence pertaining to a crime. Id. Hammel's warrantless search of the glove compartment in the present case was, therefore, permissible.

Moreover, even if the search had been improper, it did not clearly deprive the defendant of a fair trial because there was ample other evidence that the defendant was the same driver of a dark colored BMW whom Hammel had stopped earlier in the evening. Hammel recognized the defendant as the driver of the BMW that he had stopped in Trumbull earlier, the automobile had the same Georgia license plates, relatively little time had passed since the earlier stop, and the earlier stop had occurred in close proximity to the location where the defendant was taken into custody. Thus, the

action did not clearly deprive the defendant of a fair trial. See *State* v. *Golding*, supra, 213 Conn. 233. Because the defendant has failed to satisfy the third prong of *Golding*, he cannot prevail on this claim.

## III

The defendant next asserts that the trial court improperly admitted into evidence his refusal to take the atomic absorption test (AAT).[2] Specifically, the defendant claims that the admission of that evidence violated his constitutional rights (1) to counsel, in violation of the sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution; (2) to due process, in violation of article first, §§ 8 and 9, of the Connecticut constitution; and (3) against self-incrimination in violation of article first, § 8, of the Connecticut constitution. These claims were not raised at trial and are raised for the first time on appeal under *State* v. *Golding*, supra, 213 Conn. 233. We conclude that the defendant's claims fail to satisfy the third prong of *Golding*.

## A

The defendant argues, for the first time on appeal, that the admission into evidence of his refusal to submit to the AAT violated his right to counsel under the sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution.

He claims that he was twice advised of his *Miranda* rights prior to his arrival at the Trumbull police station, and that, upon his arrival there, he stated that he wanted to speak with an attorney. He further claims that he was subsequently asked to submit to an AAT and that he refused. The state argues that the record fails to show that any request was made of the defendant to

---

[2] The atomic absorption test is designed to detect the presence of gunpowder residue.

take the AAT after a request for counsel was made, if such a request was ever made. It claims that his "right to silence" was respected and that there is no indication in the record that he ever invoked his right to counsel.

It is axiomatic that the questioning of a suspect must cease once a clear request for counsel has been made. *State* v. *Stoddard*, 206 Conn. 157, 166, 537 A.2d 446 (1988). In this case, however, Hammel testified that the defendant never invoked his right to speak to an attorney and that all questioning stopped when he refused to answer further questions. The credibility of a witness is a matter for the trial court. *Habura* v. *Kochanowicz*, 40 Conn. App. 590, 594, 672 A.2d 512 (1996). We conclude that the third prong of *State* v. *Golding*, supra, 213 Conn. 233, is not satisfied because no constitutional violation clearly existed.

B

The defendant next claims that his refusal to submit to the AAT should have been excluded because it violated his privilege against self-incrimination under article first, § 8, of the Connecticut constitution.

"[C]ompulsion which makes a suspect or accused the source of real or physical evidence does not violate a person's constitutional rights as it is not such as compels communications or testimony." (Internal quotation marks omitted.) *State* v. *Chesney*, 166 Conn. 630, 640, 353 A.2d 783, cert. denied, 419 U. S. 1004, 95 S. Ct. 324, 42 L. Ed. 2d 280 (1974). Thus, our Supreme Court has held that the taking of paraffin tests does not violate the fourth and fifth amendments because "[i]n the taking of paraffin tests . . . [t]here is no testimonial compulsion either directly, as in confession, or indirectly, as in polygraph tests. Consequently, applying paraffin casts to the accused's hands [does] not violate the fourth and fifth amendments any more than fingerprinting." Id.,

640, citing *State* v. *Chin Lung*, 106 Conn. 701, 723, 139 A. 91 (1927). Similarly, the involuntary taking of an AAT involves no testimonial compulsion either directly, as in a confession, or indirectly, as in a polygraph test. See *State* v. *Chesney*, supra, 640.

We conclude that because the AAT does not involve communications or testimony, the request that a defendant submit to such a test does not constitute questioning and the refusal to submit to the AAT does not constitute the invocation of the right to remain silent. Thus, the admission of the defendant's refusal to submit to the AAT did not violate article first, § 8, of the Connecticut constitution.

C

The defendant also claims that the admission of his refusal to submit to the AAT violated his right to due process because it was used as an indication of silence in the face of accusation. Again, because such a test does not involve testimony or communications, the refusal to submit to it does not constitute invocation of the right to remain silent, and admission of the evidence of such refusal does not constitute commentary on a defendant's choice to remain silent. The claim does not rise to the level of a constitutional violation, and the third prong of *Golding* is therefore not satisfied.

Moreover, even if the defendant's claims regarding the admission into evidence of the defendant's refusal to submit to the AAT had been of constitutional magnitude, the admission of such testimony was harmless because the trial court failed to give the jury the charge requested by the state, that such evidence could be used to infer consciousness of guilt. The third prong of *Golding* is not satisfied, and the claim is, therefore, not entitled to further review.

## IV

The defendant next claims that the trial court's instruction improperly permitted the jury to render inconsistent guilty verdicts[3] on the counts of attempted murder under §§ 53a-49 and 53a-54a and attempted assault in the first degree under §§ 53a-49 and 53a-59. The defendant relies on this court's decision in *State* v. *Williams*, 39 Conn. App. 18, 663 A.2d 436 (1995), for the proposition that one cannot simultaneously possess the intent to cause death and the intent to cause serious physical injury. That decision, however, was recently reversed by our Supreme Court; *State* v. *Williams*, 237 Conn. 748, 679 A.2d 920 (1996); and is dispositive of this issue.

The Supreme Court determined that, although "§§ 53a-54a and 53a-59 (a) (1) require the same mental state, namely a specific intent . . . the particular intents required to violate these statutes are not the same. For each intent, a distinct conscious objective is sought. . . . We conclude that, under the appropriate circumstances, a defendant can simultaneously intend to cause the death of, and intend to cause serious physical injury to, the same victim." (Citations omitted; internal quotation marks omitted.) Id., 754–57. The defendant attempted, at oral argument, to distinguish *Williams* from his own case by pointing out that in *Williams*, the defendant was convicted of assault in the first degree, whereas here, the defendant was convicted of *attempted* assault in the first degree. This is a distinction without consequence. The Supreme Court's analysis in *Williams* is confined to the mental states that §§ 53a-54a and 53a-59 (a) (1) require. Pursuant to § 53a-

---

[3] Verdicts are legally inconsistent if "the existence of the essential elements for one offense negates the existence of the essential elements for another offense of which the defendant also stands convicted." *State* v. *Hinton*, 227 Conn. 301, 313, 630 A.2d 593 (1993); *State* v. *King*, 216 Conn. 585, 594–95, 583 A.2d 896 (1990), on appeal after remand, 218 Conn. 747, 591 A.2d 813 (1991).

49 (a), a person is guilty of an attempt to commit a crime if he or she acts with the same *"kind of mental state required for the commission of the crime . . . ."* (Emphasis added.) The intent required, therefore, to commit an assault in the first degree must be the same as the intent required to commit attempted assault in the first degree. Whether one has that intent in no way alters the intent to violate the assault statute. We conclude, therefore, that because the defendant could have possessed both intents simultaneously, the trial court's instruction to that effect did not permit the jury to return legally inconsistent verdicts.

## V

The defendant next claims that the sentences for his convictions of attempted murder and attempted assault in the first degree violate the guarantee against double jeopardy in the fifth and fourteenth amendments to the constitution of the United States and article first, § 9, of the Connecticut constitution.[4] With respect to these unpreserved claims, he again seeks review under *Golding.* Again focusing on the condition most relevant in the circumstances; see *State* v. *Rose,* 41 Conn. App. 701, 706–707, 679 A.2d 197, cert. denied, 239 Conn. 906, 682 A.2d 104 (1996); we conclude that the third prong of *Golding* is not satisfied because a constitutional violation does not clearly exist.

As an initial matter, we reject the defendant's argument that article first, § 9, entitles him to greater protection against double jeopardy than does the federal constitution. This court, in *State* v. *Adams,* 38 Conn. App. 643, 654–56, 662 A.2d 1327, cert. denied, 235 Conn.

---

[4] "Although the Connecticut constitution does not include a double jeopardy provision, the due process guarantee of article first, § 9, of our state constitution encompasses protection against double jeopardy." *State* v. *Nixon,* 231 Conn. 545, 550, 651 A.2d 1264 (1995), citing *Kohlfuss* v. *Warden,* 149 Conn. 692, 695, 183 A.2d 626, cert. denied, 371 U.S. 928, 83 S. Ct. 298, 9 L. Ed. 2d 235 (1962).

908, 665 A.2d 902 (1995), thoroughly examined this claim. We concluded that " '[o]ver the last fifty years, [the *Blockburger* rule] has consistently been applied by Connecticut courts in analyzing double jeopardy claims arising from multiple convictions and punishments imposed in a single trial. . . . Connecticut's citizens have no realistic expectation that they will have these double jeopardy claims scrutinized by a test that is more protective than the *Blockburger* test.' " (Citations omitted.) Id., 655–56, quoting *State* v. *Laws*, 37 Conn. App. 276, 294–95, 655 A.2d 1131 (1995); see also *State* v. *Gilchrist*, 24 Conn. App. 624, 629, 591 A.2d 131, cert. denied, 219 Conn. 905, 593 A.2d 131 (1991) (declining to extend same evidence test, which concerns successive prosecutions, to single prosecution cases). We decline, therefore, to review independently the defendant's claim under the state constitution.

"Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. . . . *State* v. *Greco*, [216 Conn. 282, 290–91, 579 A.2d 84 (1990)]. . . . Traditionally we have applied the *Blockburger* test to determine whether two statutes criminalize the same offense, thus placing a defendant prosecuted under both statutes in double jeopardy: [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. *Blockburger* v. *United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932). This test is a technical one and examines only the statutes, charging instruments, and bill of particulars as opposed to the evidence presented at trial. *State* v. *Lonergan*, [213 Conn. 74, 79, 566 A.2d 677 (1989)]." (Internal quotation marks omitted.) *State* v. *Nixon*, 231 Conn. 545, 550–51, 545 A.2d 1264 (1995). If, as the

defendant was charged, there was any element that the state was required to prove under one offense that was different from an element that the state was required to prove under the other offense, " 'the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes.' " *Brown* v. *Ohio*, 432 U.S. 161, 166, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977), quoting *Iannelli* v. *United States*, 420 U.S. 770, 785 n.17, 95 S. Ct. 1284, 43 L. Ed. 2d 616 (1975).

In order to prove the defendant guilty of attempted murder, the state was obligated to establish that he engaged in intentional conduct constituting a substantial step toward intentionally causing the death of another person. In order to prove the defendant guilty of assault in the first degree, the state was obligated to establish that he engaged in intentional conduct constituting a substantial step toward intentionally causing serious physical injury to another person. See *State* v. *Fernandez*, 27 Conn. App. 73, 96, 604 A.2d 1308, cert. denied, 222 Conn. 904, 606 A.2d 133 (1992). As we explained in part IV of this opinion, our Supreme Court has determined that the particular intents required to commit these crimes are not the same. Thus, a conviction for attempted murder requires proof that the defendant possessed the intent to cause another's death, while a conviction of attempted assault in the first degree requires proof that the defendant possessed the intent to cause serious physical injury. Each offense, therefore, requires proof of an element that the other does not. Consequently, the statutory violations charged are not the same for double jeopardy purposes, and there is no constitutional violation.[5]

---

[5] "The *Blockburger* test is a rule of statutory construction, and because it serves as a means of discerning [legislative] purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Nixon*, supra, 231 Conn. 555. The defendant offers no evidence of contrary legislative intent.

## VI

The defendant further asserts that there was insufficient evidence to sustain his conviction of attempted murder and attempted assault in the first degree. The defendant, however, fails to specify which element or elements of which crime he contends were not supported by sufficient evidence. The defendant merely maintains that "the perpetrator never said anything to the victims, there was no history of any ill will, there was no evidence of any physical injury to the victims, none of the bullets entered the passenger compartment, and there was no evidence of any 'planning' within the meaning of § 53a-49 . . . ." A fact finder may infer criminal intent from the presence of some of those factors, but the absence of those factors in the context of this case is irrelevant, the result of good fortune or both.[6] Nevertheless, because the factors cited by the defendant would pertain, in the appropriate case, to the issue of whether a defendant possessed the requisite intent to commit the crimes charged, we will review his claim on that basis.

In reviewing claims of evidentiary insufficiency, we first "construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . Ordinarily, intent can only be inferred by circumstantial evidence; it may be and usually is inferred from the defendant's conduct." (Citation omitted; internal quotation marks omitted.) *State* v. *Diaz*, 237 Conn. 518, 541, 679 A.2d 902 (1996). "Intent is a question of fact, the determination of which should stand unless the conclu-

[6] The defendant's contention that no one was injured by the gunshots is particularly irrelevant where, as here, one is convicted of an inchoate offense.

sion drawn by the trier is an unreasonable one." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 237 Conn. 757.

"A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . intentionally does . . . anything which, under the circumstances as he believes them to be, is an act . . . constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." General Statutes (Rev. to 1995) § 53a-49 (a). Thus, the state was required to prove beyond a reasonable doubt that the defendant took a substantial step toward intentionally causing the deaths of O'Connor and Mikolic; General Statutes (Rev. to 1995) § 53a-54a; and that the defendant took a substantial step toward intentionally causing them a serious physical injury. General Statutes (Rev. to 1995) § 53a-59 (a) (1). As we have discussed in part IV, one can possess the specific intent to cause a victim's death and the specific intent to cause a victim serious physical injury simultaneously. "It is axiomatic that a factfinder may infer an intent to cause serious physical injury from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted [, if any,] and the events leading up to and immediately following the incident." 1 B. Holden & J. Daly, Connecticut Evidence (1996 Sup.) § 66, citing *State* v. *Guess*, 39 Conn. App. 224, 240, 665 A.2d 126, cert. denied, 235 Conn. 924, 666 A.2d 1187 (1995); moreover, an intent to cause death may be inferred from such circumstantial evidence. 1 B. Holden & J. Daly, Connecticut Evidence (1988) § 66, citing *State* v. *Chace*, 199 Conn. 102, 105, 505 A.2d 712 (1986).

Mikolic and O'Connor each testified that the defendant pointed the gun directly at them. Mikolic testified that the defendant fired five shots at them. Hammel

testified that one bullet penetrated the driver's side door, another was deflected by the hood near the windshield and a third entered the front fender near the driver's door. He further testified that the bullets were fired from a high caliber handgun. We conclude, therefore, that the evidence presented at trial and the inferences that reasonably could be drawn from that evidence were sufficient to have allowed the jury to conclude beyond a reasonable doubt that the defendant possessed the requisite intent to commit the four charged crimes.

## VII

Finally, the defendant argues that the trial court improperly failed to instruct the jury on an element of criminal attempt. Specifically, he claims that the trial court's denial of his request to instruct the jury concerning the definition of "planned," as that term is found in § 53a-49 (a) (2),[7] violated his right to due process. In his request to charge, the defendant sought instructions defining "planned" as entailing a "method of design or act, procedure or arrangement for accomplishment of a particular act or objective."

A jury charge must be considered from the standpoint of its effect on the jury in guiding it to a proper verdict. *State* v. *Delgado*, 13 Conn. App. 139, 145, 535 A.2d 371 (1987). " 'In a criminal proceeding, there is no duty to charge the jury in the identical language requested as long as the charge is accurate, adequate and its substance properly includes material portions of the defendant's request.' *State* v. *Suarez*, 23 Conn. App. 705, 710, 584 A.2d 1194 (1991)." *State* v. *Pettway*, 39 Conn.

---

[7] General Statutes § 53a-49 (a) provides in pertinent part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

App. 63, 75–76, 664 A.2d 1125, cert. denied, 235 Conn. 921, 665 A.2d 908 (1995). The trial court's "responsibility is performed when it gives instructions to the jury in a manner calculated to give them a clear understanding of the issues presented for their consideration, under the offenses charged and upon the evidence, and when its instructions are suited to their guidance in the determination of those issues." (Internal quotation marks omitted.) *State* v. *Delgado,* supra, 145.

First, § 53a-49 (a) (2) requires an accused to have undertaken a substantial step toward committing the intended crime. This standard focuses on what act remains to be done to commit the intended crime and not what acts have been done. *State* v. *Hanks,* 39 Conn. App. 333, 341, 665 A.2d 102, cert. denied, 235 Conn. 926, 666 A.2d 1187 (1995). The defendant's request to charge concerning planning, however, attempts to shift the focus to what acts have been done and, therefore, does not accurately reflect Connecticut law.

Second, the trial court's charge, while not explicitly defining the term planned, fully explicated the elements of criminal attempt and provided guidance for a proper verdict under Connecticut law. On several occasions, the trial court instructed the jury that the state must prove that the defendant engaged in conduct that was a substantial step in a course of conduct that he planned to end in his commission of either of the intended crimes. It further instructed that preparation to commit a crime, on its own, is not necessarily sufficient, but that some preparation might be sufficient. In regards to planning, the court stated that "in order for the criminal course of conduct of the defendant to be planned, it is not necessary for the state to prove when he formed the plan or that he had it in mind for any particular period of time." The trial court's instructions, therefore, did not violate the defendant's right to due process.

The judgment is affirmed.

In this opinion the other judges concurred.